DALE PARTRIDGE, APPELLANT, v. JOHN E. YOUNGHEIN
ET AL., APPELLEES.

277 N. W. 2d 100

Filed March 27, 1979. No. 42036.

Hutton & Garden, P.C., for appellant.

Mueting & DeLay, for appellees.

Heard before BOSLAUGH, BRODKEY, and WHITE, JJ., and SPENCER, Retired Justice, and COADY, District Judge.

COADY, District Judge.

Approximately 2 weeks before his trees appeared to be dying, the plaintiff, Dale Partridge, looked into the sky, saw an airplane fly over his home and surrounding orchard, and saw a white mist emit from the plane. At that time and place, May 27, 1972, he took pictures of the plane in the air.

The plaintiff filed suit against three defendants — John Younghein; Skyways, Inc., a corporation; and the City of Norfolk. The plaintiff answered certain interrogatories on December 3, 1973, and made certain admissions on March 8, 1974. The plaintiff deposed John Younghein on September 9, 1974. The defendants deposed the plaintiff on September 21, 1974. Upon motion for summary judgment, the plaintiff's cause against the City was dismissed on March 7, 1977. That dismissal is not before us on appeal.

E. Myron Erickson was deposed on December 14, 1977. On February 3, 1978, and upon motion for summary judgment, the trial court dismissed plaintiff's cause against the remaining defendants after having properly considered the depositions, admissions, and answers to interrogatories mentioned above and the pleadings. Plaintiff appeals from the second ruling on summary judgment and we affirm.

John Younghein was the president of Skyways, Inc. and the pilot of the airplane witnessed by the plaintiff. He, on behalf of said corporation, was spraying a 2,4-D amine weed-killer solution over and on city property at the request of the City of Norfolk. The city's property is across the road from plaintiff's 5-acre tract. About his house, the plaintiff had 6 pear trees, 6 peach trees, and 267 apple trees with eight different varieties of apples. The plaintiff pleads that defendants' drifting spray killed 71 trees, ruined the 1972 fruit crop, and substantially reduced the 1973 crop.

The plaintiff took pictures of the plane on May 27, 1972, because he had been "warned by previous owners and such * * * if we ever saw a plane or anything like that to make sure you get the identification numbers and stuff." He was not worried on that day and did not do anything for a couple of weeks. After 2 weeks, he first noticed something wrong. "My blooms were touching leaves and foliage and the foliage was falling like curling up." The leaves were green with spots on them. The fruit was drying up. The fruit had oil on it. The leaves of the peony bushes about the house were curling up and had black spots. His flowers all had spots on them, but they did bloom and did not die. His tomato plants died.

On said discovery date, plaintiff called John Younghein and the two of them inspected the premises in the presence of four other people. Mr. Younghein took some cuttings and mailed them to the Uni-

versity of Nebraska for examination and analysis. The cuttings were taken from trees near the plaintiff's house.

The plaintiff testified that when defendant Younghein got his report back, the plaintiff did not believe either the defendant or the report. The plaintiff then took cuttings from the center of the orchard where the damage was more severe. He sent his own cuttings to the University of Nebraska, the University of South Dakota, and the Erickson Laboratory in Fremont. Plaintiff's cuttings were first sent to the University of Nebraska.

The plaintiff claimed the written reports he received were his counsel's work product and he has not disclosed their contents. However, he testified that the Erickson Lab and the University of South Dakota found oil residue on the cuttings submitted to them. He testified that they reported fuel oil damage. He also said they reported some trees would have built up immunities to herbicides and others would not have.

The plaintiff did admit he received two letters from an extension assistant at the University of Nebraska. The first letter, dated June 19, 1972, read as follows: "Your letter to Mr. Howard White concerning apples was sent to John Furrer, Extension Pesticide Specialist at the University. He examined the leaves and found no visible evidence of herbicide injury. After his examination the sample was forwarded to me for disease diagnosis.

"There are two diseases which are causing the condition which you are concerned about. The first is apple scab. While the level of infection is relatively low it is causing some discoloration of the foliage. Of greater concern is a disease known as fire blight. One of the more typical symptoms of this disease is the development of mumified fruits which you have described. It will also cause a blackening and subsequent death of the leaves. From the sample

you sent I would say that you have a heavy infestation of this disease which should be controlled in the near future.

"I have enclosed two extension bulletins on apple diseases and fire blight which you may find useful. If you have further questions, please feel free to write or call."

The second letter, dated June 23, 1972, read as follows: "There seems to be some confusion on what trees are being attacked by which organism. The samples I received today have some fire blight on them but it is not as severe as the previous sample. The major cause for concern on this set of samples is apple scab. If you will notice the discolored and brown tissue have darker spots on them. This is the result of a severe reaction to apple scab. The darker spots are the site of the original infections.

"You brought out a good point about the resistance to fire blight and I will try to explain this. First of all, the susceptibility chart is a relative chart and by no means absolute. Under certain environmental conditions the resistance of one variety may break down. There is also the possibility that the strain of bacteria attacking the apples are more virulent or more potent.

"If this were herbicide injury there would be no noticeable differences among varieties. Since 2,4-D is actually a growth hormone it would affect all apple tissue in a similar manner. Evidently this is not the case. This, combined with microscopic and visual examination all indicate that the damage is not the result of a herbicide."

The deposition of Mr. Erickson from Erickson Laboratories disclosed that he had found a trace of fuel oil on the cutting he examined. He testified that his examination was not intended to discover disease and that he had no expertise or ability concerning diseases. He did not believe the amount of fuel oil he found could have damaged a tree. He did examine

the cuttings submitted to him for traces of herbicide and herbicide damage. Because of the effect which climatic conditions have on the subject, the deponent could not say how long traces of 2,4-D last on a leaf or twig but that 2,4-D does penetrate plant surfaces.

The primary purpose of the summary judgment statute is to pierce sham pleadings and to dispose of, without the necessity, expense, and delay of trial, those cases where there is no genuine claim or defense. Pfeifer v. Pfeifer, 195 Neb. 369, 238 N. W. 2d 451 (1976). It is effective and serves a separate, useful purpose when it can be used to pierce the allegations of the pleadings and show conclusively that the controlling facts are otherwise than as alleged. Eden v. Klaas, 165 Neb. 323, 85 N. W. 2d 643 (1957).

The crux of the decision to be made here is only related to the question as to whether defendants' spray got on plaintiff's orchard. That clearly is a disputed fact. But for purposes of summary judgment, that is decided against defendants. Any reasonable doubt touching the existence of a material issue of fact must be resolved against the moving party. Farro v. Rubottom, *ante* p. 120, 274 N. W. 2d 149 (1979).

The basic question raised by the evidence and the briefs is whether reasonable minds might decide herbicide poisoning caused the leaves to curl, the fruit to shrivel, and the trees to die or was a proximately contributing cause of the same. In this respect, the court should take that view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences which may be drawn from the evidence. If, when so viewed, reasonable men might reach different conclusions, the motion should be denied and the case tried on its merits. Farro v. Rubottom, *supra.*

Without producing them at the deposition or at

the hearing on the motion for summary judgment, the plaintiff says the reports from Erickson Lab and the University of South Dakota reported fuel oil damage. Plaintiff said his work product reports disclose some herbicide immunity theory as opposed to disease resistance mentioned by the Nebraska extension assistant which, we guess, was an attempt to discredit the University of Nebraska reports. Evidence consisting of denials, general allegations, conclusions, arguments, and statements that would not be admissible in evidence is of no avail in opposition to a motion for summary judgment. Evidence opposing the rendition of a summary judgment, to be effective, must be made on personal knowledge and show affirmatively that affiant is competent to testify to the matters stated therein. Eden v. Klaas, *supra*.

Upon reviewing the facts above stated, the reader will notice that there are three obvious facts in this case concerning the issue of proximate cause. First, the hard and direct evidence points to disease. Second, some of the circumstantial evidence points to disease and some to herbicide poisoning. Third, nowhere in pleadings or his evidence does plaintiff even deny that his trees were diseased. Based on the evidence before us, and there are some aspects of the adversary system left in this modern day, we cannot say that reasonable men might conclude that a proximately contributing cause of plaintiff's damage was the defendants' drifting spray.

Because summary judgment is not favored and our research has found it to be an extremely technical procedure, we have intentionally refrained from mentioning any evidence taken from the deposition of John Younghein except those parts which were helpful to the plaintiff's contentions. Some perspective may be gained from his testimony that he made as an expert by reason of his trade. He testified that 2,4-D damage should have been visible on the small broadleaf plants about the plaintiff's premises within 24 to

48 hours and noticeable long before the end of 2 weeks.

He also testified he used white smoke to test the wind south of plaintiff's premises but that he was always east and away from said premises when he applied spray. That portion of the city property south of and along plaintiff's house and orchard, Younghein claimed to have sprayed by hand from the ground.

The judgment of the trial court was correct and is affirmed.

AFFIRMED.

WHITE, J., concurs in result.